McMahon, Chief Judge:
On remand from the Second Circuit, this Court must decide whether the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. ("ERISA"), allows Plaintiff Emily DeRogatis to "surcharge" the trustees of one ERISA plan for a breach of trust that caused her to lose benefits under another, related plan.
Until recently, monetary compensation was unavailable in an action alleging a violation of section 502(a)(3) of ERISA because such claims were legal rather than equitable in nature. Mertens v. Hewitt Assocs. , 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). In 2011, however, the United States Supreme Court ruled that beneficiaries suing fiduciaries under section 502(a)(3) could in certain circumstances obtain monetary compensation in the form of an equitable "surcharge." CIGNA Corp. v. Amara , 563 U.S. 421, 442, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011) (Amara ). Before Amara , surcharge was available only in cases in which the trustees were unjustly enriched or caused a loss to the trust res. Id. In Amara , however, the Supreme Court held that the "surcharge remedy extend[s] to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary"-even if the trustees were not personally enriched thereby or the trust did not lose assets. Id.
In this very sad case, operating engineer Frank DeRogatis was diagnosed with terminal cancer. After his diagnosis, Plaintiff Emily DeRogatis received erroneous information about the possible termination of her husband's healthcare benefits from a claims specialist employed by Frank's healthcare plan-the Welfare Fund of the International Union of Operating Engineers Local 15, 15A, 15C & 15D, AFL-CIO (the "Welfare Fund"). Fearing a loss of medical benefits at a time when her husband was hospitalized and dying, she declined to submit an early retirement election that Frank had signed in order to maximize the pension benefit that she would receive after his death. As a result, Emily was not eligible for augmented survivor's benefits under the terms of his pension plan-the Central Pension Fund of the International Union of Operating *312 Engineers and Participating Employers (the "Pension Plan").
After Frank's death, Emily brought lawsuits against the Welfare Fund and the Pension Plan,[1] in a quest to obtain the augmented benefit that would have been available to her had she submitted Frank's early retirement papers. This Court granted summary judgment in favor of defendants, and DeRogatis appealed. The Court of Appeals affirmed this Court's award of summary judgment in favor of the Pension Plan-the terms of which clearly barred giving Emily the augmented benefit-but concluded that there were genuine issues of material fact about the potential liability of the Welfare Fund for a breach of fiduciary duty based on the actions of its employees. Specifically, the Second Circuit concluded that there were genuine issues of material fact about (i ) whether the trustees were acting as fiduciaries to DeRogatis when a Welfare Fund employee provided erroneous advice to Emily; and, if they were, (ii ) whether the trustees breached those fiduciary duties through a combination of a misleading summary plan description ("SPD") and the erroneous advice. However, the Court of Appeals observed that the Welfare Fund could still obtain summary judgment if it established on remand that DeRogatis was not entitled to equitable relief under the circumstances-an issue that neither party had briefed before this Court in connection with the motions for summary judgment.
Presently before the Court is the Welfare Fund's renewed motion for summary judgment, on the grounds that DeRogatis has no claim for an equitable remedy under the circumstances of this case. Also before the Court is DeRogatis' cross-motion for summary judgment on the issue of whether the Welfare Fund breached its fiduciary duty.
For the reasons that follow, both motions are denied.
BACKGROUND
I. Facts
The Court assumes familiarity with the facts of the case from the Court's previous decisions, DeRogatis v. Bd. of Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs , No. 13-cv-8788, 2015 WL 1923544 (S.D.N.Y. Apr. 2, 2015) (DeRogatis I ); DeRogatis v. Bd. of Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs, 167 F. Supp. 3d 574 (S.D.N.Y. 2016) (DeRogatis II ); DeRogatis v. Bd. of Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emp'rs , No. 13-cv-8788, 2016 WL 5805283 (S.D.N.Y. Sept. 19, 2016) (DeRogatis III ), and the Second Circuit's decision, In re DeRogatis , 904 F.3d 174 (2d Cir. 2018) (DeRogatis IV ). A brief overview of the facts, taken from these decisions, is provided below. For purposes of the Welfare Fund's current summary judgment motion, the facts are taken in the light most favorable to DeRogatis.
Frank DeRogatis was an operating engineer and member of the International Union of Operating Engineers Local 15 ("Local *313 15"). The Union provides its members with both medical (welfare) and pension benefits. Medical benefits are administered locally, through the Welfare Fund's New York City-based office. Pension benefits are administered centrally, through the Pension Plan's Washington, D.C. based-office. The two plans have no formal affiliation with each other, except that they both serve Local 15 members.
As the Pension Plan's Washington, D.C. office is not readily accessible to New York City-based members of the Local 15, employees of the Welfare Fund occasionally provide advice related to pension benefits under the Pension Plan. That is what happened in this case.
After Frank DeRogatis was diagnosed with terminal cancer in January 2011, he and his wife Emily met with Patrick Keenan, an office administrator for the Welfare Fund, to learn about Frank's post-retirement options for health benefits and pension benefits. Based on what Keenan told him, Frank then filled out and signed the paperwork to apply for early retirement. He did this because, under the terms of the Pension Plan, the surviving spouse of a retired Local 15 member would receive a higher monthly benefit than the surviving spouse of a member who died while employed. To put numbers on the difference: if Frank died while employed, Emily was entitled to a Preretirement Annuity of $ 787 per month; if he died after retiring, Emily could qualify for a Joint Annuity (the "100% Joint Annuity"), which would pay her as much as $ 1,076 per month. So by retiring, at age 61 instead of waiting until age 62, Frank could leave Emily with a pension benefit worth almost $ 300 more each month.
When Frank was hospitalized with pneumonia in late July 2011, Emily brought the signed retirement paperwork to the local Welfare Fund office for filing. However, before she submitted the paperwork, claims specialist Richard Lopez told her that the DeRogatises would lose their health benefits if Frank retired before reaching the age of 62. This was not correct. What Lopez should have said was that Frank would stop accruing additional health benefits (which were credited to Local 15 members every four months based on hours worked) if he retired early-although since he was dying, not working, this would hardly have mattered. Taking early retirement would not have left Frank without health insurance benefits.
But Emily thought that submitting the early retirement paperwork would jeopardize Frank's access to health insurance. So she did not submit it. Instead, she applied for a short-term disability benefit from the Welfare Fund.
Frank died less than two months later, in September 2011.
In strict accordance with the terms of the Pension Plan, Emily began receiving the lower, $ 787/month Preretirement Annuity. Emily tried to submit Frank's signed retirement papers after his death and contested the Pension Plan's determination. After several unsuccessful rounds of administrative appeals, Emily brought parallel ERISA cases in this Court against both the Pension Plan (13-cv-8788) and the Welfare Fund (14-cv-8863).
II. Present Proceedings
A. Procedural History
After discovery, the Court granted summary judgment to the Pension Plan defendants, finding as a matter of undisputed fact that the Pension Plan had not acted arbitrarily or capriciously or breached any fiduciary duty in denying DeRogatis' request for an augmented survivor's benefit after her husband's death.
*314 DeRogatis I , 2015 WL 1923544, at *7-*8 ; DeRogatis III , 2016 WL 5805283, at *9.
The Court also granted summary judgment to the Welfare Plan. I concluded that a plan administrator could not be held liable for unintentional misrepresentations made about the plan's operation by Lopez, who was a purely "ministerial" agent and not a fiduciary. DeRogatis II , 167 F. Supp. 3d at 582.
DeRogatis appealed. The Second Circuit affirmed the grant of summary judgment to the Pension Plan, but overturned the grant of summary judgment to the Welfare Plan. DeRogatis IV , 904 F.3d at 180. Citing Estate of Becker v. Eastman Kodak Co. , 120 F.3d 5, 10 (2d Cir. 1997), the panel ruled that "a plan administrator ... may be liable for fiduciary breach based on a combination of unclear summary plan descriptions and misleading statements made by benefits counselors." DeRogatis IV , 904 F.3d at 186. The Court of Appeals concluded that because there was a genuine issue of material fact about whether the Welfare Fund's summary plan description ("SPD") was sufficiently clear about whether medical benefits could be lost due to early retirement-as well as whether the representations made by Keenan and Lopez were misleading-Emily might well succeed in proving the first two elements of a fiduciary breach claim against the Welfare Fund at trial. Id. at 199.
However, there are three elements to such a claim. The third is whether "appropriate equitable relief" is available. As neither party had briefed this issue in their summary judgment papers, the Second Circuit remanded so this Court could consider in the first instance whether Emily might be entitled to any equitable remedy against the Welfare Fund. Id. at 199-200. Obviously, if she were so entitled, the existence of questions of fact as identified by the Circuit would necessitate a trial.
The Court of Appeals directed that, "On remand, the District Court should consider whether Emily will be entitled to a surcharge or some other form of 'appropriate equitable relief' under ERISA section 502(a)(3) if she successfully proves that the Welfare Fund breached a fiduciary duty." Id. The Court of Appeals catalogued the types of equitable relief that might be available to Emily under the statute: "estoppel, equitable reformation of plan terms, or a monetary 'surcharge' to recompense 'a loss resulting from a [fiduciary's] breach of duty, or to prevent the [fiduciary's] unjust enrichment[.]' " Id. at 199 (quoting Amara , 563 U.S. at 440-42, 131 S.Ct. 1866 ). One such form of equitable relief was off the table from the start; the Court of Appeals definitively rejected the availability of any injunctive remedy against the Welfare Fund, because it does not administer pension benefits. "[T]he District Court could not enjoin the Welfare Fund to enroll her in a survivor benefit over which that Fund has no control." Id. at 199. The Circuit observed-albeit without deciding the issue-that DeRogatis might be able to surcharge the Welfare Fund, whose employee(s) had misled her, to "compensate her for the difference between the 100% Joint Annuity and the Preretirement Annuity, both retrospectively and on an ongoing basis." Id.
DISCUSSION
I. Legal Standards
A. Summary Judgment
Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*315 Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52, 106 S.Ct. 2505. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. Westinghouse Elec. Corp. v. N.Y.C. Transit Auth. , 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting Anderson , 477 U.S. at 249, 106 S.Ct. 2505 ). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson , 477 U.S. at 247-48, 106 S.Ct. 2505 (emphasis in original).
B. ERISA Section 502(a)(3)
ERISA provides, in relevant part, "A civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]" 11 U.S.C. § 1132(a)(3). Section 502(a)(3) acts as a "safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." Varity Corp. v. Howe , 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).
DeRogatis alleges that the Welfare Fund violated its fiduciary duty "to provide complete and accurate information" to plan members. See DeRogatis IV , 904 F.3d at 190. "[T]o state a claim under section 502(a)(3) for fiduciary breach based on a defendant's alleged failure to provide complete and accurate information about plan benefits, a plaintiff must establish three elements: (1) the defendant was performing a fiduciary function when it engaged in the conduct at issue in the complaint; (2) the defendant breached a fiduciary duty; and (3) the plaintiff is entitled to equitable relief." Id. (citing Bell v. Pfizer , 626 F.3d 66, 73-74 (2d Cir. 2010) ; Amara , 563 U.S. at 443-45, 131 S.Ct. 1866 )).
The Court of Appeals concluded that the Welfare Fund was not entitled to summary judgment on the first element, because "a factfinder could reasonably conclude that the Funds performed a fiduciary function when speaking through the Welfare Fund's ministerial employees." Id. at 191 (emphasis omitted). Similarly, the Court of Appeals concluded that the Welfare Fund was not entitled to summary judgment on the second element, because "under Becker , DeRogatis may be able to show a breach [of] fiduciary duty" based on the combination of an unclear SPD and oral misrepresentations from Lopez. Id. at 193.
C. Equitable Relief Under Section 502(a)(3)
Whether the Welfare Fund can obtain summary judgment dismissing the claim against it depends on whether it can establish that no appropriate equitable relief is available to DeRogatis. Id. at 199. "[T]o help frame the District Court's analysis on remand," the Second Circuit laid out the relevant standard:
The Supreme Court has interpreted this provision as making available "those categories of relief that ... were typically available in equity." Amara , 563 U.S. at 439, 131 S.Ct. 1866 (internal quotation marks and emphasis omitted). In addition to injunctions, plaintiffs asserting a claim under section 502(a)(3) may seek remedies *316 such as estoppel, equitable reformation of plan terms, or a monetary "surcharge" to recompense "a loss resulting from a [fiduciary's] breach of duty, or to prevent the [fiduciary's] unjust enrichment." Id. at 440-42, 131 S.Ct. 1866. The showing required of a plaintiff proceeding under section 502(a)(3) thus depends in part on the particular form of equitable relief sought. See id. at 443-44, 131 S.Ct. 1866 (noting that "detrimental reliance" is a required element for estoppel, but not for reformation or surcharge).
Id.
As the moving party, the Welfare Fund covers the waterfront, and exhaustively argues that no equitable remedy-including injunction, reformation, estoppel, or surcharge-is available to DeRogatis. In her opposition papers, DeRogatis does not address the Welfare Fund's contention that injunction, reformation, or estoppel are not available; this I interpret as a concession that they are not available equitable remedies. Instead, Plaintiff focuses exclusively on the availability of what she wants-which is an additional $ 300 per month-and argues that she is entitled to surcharge the Welfare Fund's trustees because of their employee's error.
I, too, will limit my discussion to the availability of equitable surcharge. See Lykins v. IMPCO Techs., Inc. , No. 15-cv-2102, 2018 WL 3231542, at *12 (S.D.N.Y. Mar. 6, 2018).
D. The Surcharge Remedy Generally
Any discussion of surcharge must begin with the United States Supreme Court's decision in Amara.
In Cigna Corp. v. Amara , 563 U.S. 421, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011) (Amara ), the United States Supreme Court markedly expanded the availability of this form of relief under section 502(a)(3). Id. at 441-42, 131 S.Ct. 1866. While courts had previously agreed that any relief that was primarily monetary in nature was legal rather than equitable in nature-and so was not available under ERISA, which did not provide a cause of action for money damages-the Supreme Court in Amara stated that it was possible under section 502(a)(3) to obtain monetary relief in the form of an "equitable surcharge." Id. The Court reasoned, "Equity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." Id. at 441, 131 S.Ct. 1866 (citing Restatement (Third) of Trusts § 95 ). It further reasoned that such relief, if brought against a trustee or other fiduciary prior to the merger of law and equity, was "exclusively equitable." Id. at 442, 131 S.Ct. 1866 (quoting Princess Lida of Turn and Taxis v. Thompson , 305 U.S. 456, 464, 59 S.Ct. 275, 83 L.Ed. 285 (1939) ). The Amara court recognized that a "surcharge" could be appropriate to prevent a trustee from being unjustly enriched by his breach, or to recompense a beneficiary for a loss caused by the trustee's breach. Id. The latter is sometimes known as "make whole" relief, and it is what is at issue here, since there is no question that the trustees of the Welfare Fund have not been enriched at all by the alleged breach.
Since Amara , circuit courts have allowed beneficiaries to proceed against fiduciaries for monetary compensation under a "make whole" theory. In Kenseth v. Dean Health Plan, Inc. , 722 F.3d 869 (7th Cir. 2013), for example, a plaintiff-beneficiary sought "make whole" relief from her health insurer in the form of a payment (about $ 78,000) for a surgical procedure that a customer service representative of the insurer had told her would be covered, *317 but which was not in fact covered under the terms of the plan. Id. at 871-72. Finding that Amara "significantly altered the understanding of equitable relief available under section 1132(a)(3)," the Seventh Circuit concluded that "the relief available for a breach of fiduciary duty under section 1132(a)(3) is broader than we have previously held, and broader than the district court could have anticipated before the Supreme Court's decision in [Amara ]." Id. at 876, 880. It concluded, "We can now comfortably say that if Kenseth is able to demonstrate a breach of fiduciary duty as we set forth in our first opinion, and if she can show that the breach caused her damages, she may seek an appropriate equitable remedy including make-whole relief in the form of money damages." Id. at 883. The Court thus vacated the district court's award of summary judgment in favor of the healthcare plan. Id. at 870.
Similarly, in McCravy v. Metropolitan Life Ins. Co. , 690 F.3d 176 (4th Cir. 2012), the Fourth Circuit reversed a partial grant of summary judgment to a life insurance plan, finding that Amara permitted the plaintiff-beneficiary to pursue an equitable surcharge remedy against the plan for refusing to pay death benefits. Id. at 181-82. Although the plan's terms limited life insurance coverage to dependents nineteen years of age and younger, the plan had accepted premiums paid by McCravy on behalf of her daughter up until the time of her daughter's murder at the age of 25. Id. at 178. After her daughter died, the plan tried to refund six years of premiums rather than pay out the full death benefit. Id. In light of Amara , the Fourth Circuit held that the plan could be "surcharged," not only for the premiums that McCravy had paid after her daughter's nineteenth birthday-when, in theory, her daughter was not eligible for coverage-but also for the full amount of the death benefits. Id. at 181-82.
Similarly, in Gearlds v. Entergy Servs., Inc. , 709 F.3d 448 (5th Cir. 2013), the Fifth Circuit overturned the district court's order dismissing a plaintiff-beneficiary's case under section 502(a)(3). Id. at 452. The court found that Amara made surcharge available to compensate a retired plan beneficiary who had waived health insurance coverage through his wife's employer, in detrimental reliance on oral and written communications from his own plan that he would continue to receive medical benefits after electing early retirement. Id. at 449-50, 452.
Since Amara , district courts in this circuit have also recognized that surcharge is one of the "remedies generally available under § 502(a)(3), even if the practical result of entering such relief is a monetary payment." Amara v. CIGNA Corp. , 925 F. Supp. 2d 242, 250 (D. Conn. 2012) ( Amara II ), aff'd , 775 F.3d 510 (2d Cir. 2014) ; D'Iorio v. Winebow, Inc. , 68 F. Supp. 3d 334, 358 (E.D.N.Y. 2014) ; see also Mcguigan v. Local 295/Local 851 I.B.T. Emp'r Grp. Pension Plan , No. 11-cv-2004, 2011 WL 3421318, at *4 n.6 (E.D.N.Y. Aug. 4, 2011) ; Cates v. Trs. of Columbia Univ. in City of N.Y. , No. 16-cv-06524, 330 F.R.D. 369, 374 n.4, 2019 WL 1433709, at *4 n.4 (S.D.N.Y. Apr. 1, 2019) ; Osberg v. Foot Locker, Inc. , 555 F. App'x 77, 81 (2d Cir. 2014) (summary order); Estate of Raymond Thomas v. Cigna Grp. Ins. , No. 09-cv-5029, 2016 WL 7235718, at *10 (E.D.N.Y. Dec. 13, 2016).
E. Requirement To Show Harm and Causation
"[T]o obtain relief by surcharge" for misrepresentations by plan fiduciaries, a "beneficiary must show that the violation injured him or her." Amara , 563 U.S. at 444, 131 S.Ct. 1866. "But to do so, he or *318 she need only show [actual] harm and causation." Id.
On Amara 's remand from the Supreme Court, my Connecticut colleague, Judge Janet Bond Arterton, elaborated on the "harm and causation" standard. Amara II , 925 F. Supp. 2d at 257-59. Amara II has since been used by other courts in this district to analyze whether equitable surcharge is available under section 502(a)(3). See, e.g. , Laurent v. PricewaterhouseCoopers LLP , No. 06-cv-2280, 2018 WL 502239, at *3 (S.D.N.Y. Jan. 19, 2018).
Amara II explains that, for beneficiaries seeking monetary surcharge against fiduciaries on a "make whole" theory of relief, "actual harm" may consist of either: (i ) "detrimental reliance," Amara II , 925 F. Supp. 2d at 257 (quoting Amara , 563 U.S. at 444, 131 S.Ct. 1866 ), or (ii ) "those losses (or harms or injuries) that a plaintiff-beneficiary can establish were caused by the fiduciary breach," id. ; see also Laurent , 2018 WL 502239, at *3. The harm cannot consist simply of deprivation of accurate information; rather, a plaintiff must raise a genuine issue of material fact "that the deprivation ... resulted in a benefit to the [defendants] or damages to plaintiff[.]" Miles v. Corning Inc. Long Term Disability Plan , 948 F. Supp. 2d 295, 298 (W.D.N.Y. 2013).
To show causation, detrimental reliance is "sufficient but not necessary." Amara II , 925 F. Supp. 2d at 257-58. Absent detrimental reliance, "but-for (or factual) causation" is the proper standard. Id. at 258. Assessing "but-for" causation in the ERISA context requires the court to "imagine a counterfactual world" in which the disclosures and representations were not misleading, and then "to consider whether it was more likely than not in this conjured world that Plaintiff[ ] would not have been harmed." Id. at 258.
In this case, Emily relied to her detriment on representations made by a Welfare Fund employee about the potential loss of her husband's health benefits and declined to submit his early retirement papers. She also argues that the fiduciary breach caused her to lose almost $ 300 each month since her husband's death in pension benefits-benefits she would have received had she followed Frank's instructions and submitted his early retirement papers-which means she is arguing "but-for" factual causation. It appears, then, that Emily may be entitled to equitably surcharge the Welfare Fund under either theory.
Amara II notwithstanding, the Welfare Fund moves for summary judgment, arguing that DeRogatis is not entitled to equitable relief, because (i ) the relief she seeks is not traceable to particular assets of the Welfare Fund; (ii ) payment to DeRogatis would be inconsistent with the terms of the Welfare Fund Trust Agreement and so would cause the Trustees to breach their fiduciary duty to the members; and (iii ) surcharge cannot be a "standalone" remedy.
Each of these arguments lacks merit.
F. Surcharge Does Not Require Traceability
Despite the overwhelming similarity between the facts of this case and the facts in Kenseth , Gearlds , and McCravy , the Welfare Fund first argues that the relief DeRogatis seeks is not "equitable," because it is not traceable to specific assets or property in the Welfare Fund trust, which has no funds attributable to the pension benefit in question. (Mem. of Law in Supp. of the Local 15 Welfare Fund Defs.' Mot. for Summ. J. ("Br."), Dkt. No. 88 at 4-5.)
The *319 Welfare Fund relies on Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co. , 771 F.3d 150, 153-54 (2d Cir. 2014) in making this argument. Central States , however, was not a case involving equitable surcharge. The Central States court held, post-Amara , that restitution in the form of a constructive trust or equitable lien can be imposed only if the "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." Id. (emphasis removed). That has nothing to do with the imposition of an equitable surcharge -which under the law of trusts was levied directly against the trustees, and which is distinct from and (after Amara ) more expansive than restitution. Restatement (Third) of Trusts § 95 (2012) ; see also Great-W. Life & Annuity Ins. Co. v. Knudson , 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) (restitution and equity not synonymous); D'Iorio , 68 F. Supp. 3d at 358 (surcharge extends to "losses that may have occurred beyond restitution"); McCravy , 690 F.3d at 181-82 (surcharge remedy not limited to a premium refund).
Relatedly, the surcharge remedy, as understood by the Amara court in the ERISA context, requires neither unjust enrichment nor the loss of "particular" plan funds, as would previously have been required to surcharge a trustee. See Gabriel v. Alaska Elec. Pension Fund , 755 F.3d 647, 667 (9th Cir.) (Berzon, J., concurring and dissenting), opinion withdrawn and superseded , 773 F.3d 945, 949-50 (9th Cir. 2014) (ordering district court to evaluate propriety of equitable surcharge remedy). Amara departs from the old common law rule that "make-whole relief against a trustee for breach of fiduciary duty" is available "only when the breach (1) results in a loss to the trust estate; or (2) allows the fiduciary to profit at the expense of the trust." Gabriel , 755 F.3d at 667 (Berzon, J., concurring and dissenting) (alterations and quotation omitted). Instead, a "surcharge remedy extend[s] to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary." Id. (emphasis in original) (quoting Amara , 563 U.S. at 442, 131 S.Ct. 1866 ). As other courts have observed, "the Supreme Court clearly contemplates that surcharge is available under § 502(a)(3) even absent a loss to the ERISA plan itself" Amara II , 925 F. Supp. 2d at 257.
DeRogatis does not seek "restitution" of anything. Nor does "surcharge" under Amara require DeRogatis' injury to be traceable to any particular Welfare Fund assets. Therefore, the Welfare Fund is not entitled to summary judgment on this ground.
G. Neither the Trust Agreement Nor McCutchen Bars DeRogatis From Seeking Relief
The Welfare Fund next argues that DeRogatis cannot use the surcharge theory to seek compensation for lost pension benefits because the Welfare Fund Trust Agreement allegedly prohibits Fund assets from being used for anything other than the payment of healthcare benefits for its members. (Br. at 7-8.) Its argument depends, in large part, on dicta from US Airways, Inc. v. McCutchen , 569 U.S. 88, 133 S.Ct. 1537, 185 L.Ed.2d 654 (2013).
In McCutchen , the plaintiff, an employee of US Airways, was injured in a car crash that was wholly the fault of another driver. 569 U.S. at 92, 133 S.Ct. 1537. He ultimately incurred $ 67,000 in medical expenses. Id. Per the terms of the plan, US Airways fronted McCutchen's medical expenses. Id. McCutchen subsequently recovered $ 110,000 by settling his private tort action against the person responsible for the accident and by collecting on a claim he filed with his auto insurer; 40% of *320 that sum went to pay his attorneys' fees. Id.
US Airways sued McCutchen to recover its $ 67,000 outlay for medical expenses, relying on the following plan provision:
If [US Airways] pays benefits for any claim you incur as the result of negligence, willful misconduct, or other actions of a third party, ... [y]ou will be required to reimburse [US Airways] for amounts paid for claims out of any monies recovered from [the] third party, including, but not limited to, your own insurance company as the result of judgment, settlement, or otherwise.
Id. The U.S. Supreme Court granted certiorari to decide the narrow question of whether this plan language precluded McCutchen from raising equitable defenses in a suit by the plan to recover the medical expenses it had fronted. Id. at 95-96, 133 S.Ct. 1537. Specifically, the Court was asked to determine whether (a ) unjust enrichment and/or (b ) the common fund doctrine could be used to (x ) force the plan to absorb a percentage of the attorneys' fees, and/or (y ) apportion its recovery based on that portion of the $ 110,000 that was meant to compensate McCutchen for medical expenses (versus, e.g. , pain and suffering or loss of future earnings). Id.
The Supreme Court held that the plain terms of the plan barred McCutchen from raising these equitable defenses. Id. at 98, 133 S.Ct. 1537. The Court reasoned that the parties had entered into a contract that created an "equitable lien by agreement" on any funds recovered by McCutchen, and it is black-letter law that, under that doctrine, when the relevant terms are reduced to writing, "The agreement itself becomes the measure of the parties' equities." Id. at 99-100, 133 S.Ct. 1537. The Court held that its analysis "fit[ ] lock and key with ERISA's focus on what a plan provides." Id. at 100, 133 S.Ct. 1537. "The section under which this suit is brought 'does not, after all, authorize 'appropriate equitable relief' at large,' Mertens , 508 U.S. at 253 [113 S.Ct. 2063] (quoting § 1132(a)(3))." Id. "Rather, it countenances only such relief as will enforce 'the terms of the plan' or the statute, § 1132(a)(3)[.]" Id. (emphasis removed).
The Welfare Fund submits that these same principles should preclude DeRogatis from seeking what are essentially pension benefits, but paid out of the Welfare Fund. They argue that certain paragraphs of the Welfare Fund Trust Agreement constitute a de facto contract between plan beneficiaries and trustees that limits recovery to medical benefits. They identify two provisions of the Trust Agreement that (allegedly) prohibit the trustees of the Welfare Fund from using the fund's assets for anything other than member healthcare benefits:
WHEREAS: The Union, the Associations and the Employers desire to establish a Trust under which the moneys paid on account of medical and hospital care and related benefits will be held in a trust fund to be known as the WELFARE FUND OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNIONS 15, 15A, 15C, 15D, AFL-CIO (hereinafter referred to as the "Welfare Fund"), and to designate trustees to receive, hold, administer and disburse said moneys and other properties owned by the Welfare Fund, and to define the powers, duties and responsibilities of the Trustees;
(Steinberg Decl. Ex. A at 2.)
The purposes of the Trust Fund shall be to provide, pursuant to the Welfare Plan, medical care, hospital care, life insurance, disability and sickness benefits, and all other kindred benefits, *321 for the Employees eligible thereto hereunder.
(Id. at 6, Article III.)[2] (Br. at 8.)
But nothing in the Fund Agreement prohibits the imposition of a surcharge on the Fund's Trustees. As a matter of simple fact, the Trust Agreement does not require that every dollar collected be spent on medical benefits; otherwise, the Fund could not administer itself-rent space, pay its employees, keep the lights on. (See, e.g., id. at 11, Art. VI, First, (i) (property taxes); id. at 12, Art. VI, First, (o) (administrative staff).) Moreover, the Trust Agreement authorizes the use of trust funds to indemnify its trustees. (Id. at 22, Art. XI, Sixth.) The trustees would surely apply for indemnification if they were to be surcharged because of the bad advice given by a subordinate to a member, and the Fund is permitted to pay such indemnification. That alone disposes of the Fund's argument that the trustees would be diverting funds from an allowable use to one that is not authorized.
McCutchen is not to the contrary. McCutchen was not an equitable case at all; it was a simple contract case, as the Supreme Court held, and under the plain terms of the contract, the company had an equitable lien on any recovery McCutchen might get from anyone in connection with his accident, whether by suit or by allowed insurance claim, up to $ 67,000. McCutchen , 569 U.S. at 98, 133 S.Ct. 1537 ; see also Cognetta v. Bonavita , 330 F. Supp. 3d 797, 812 (E.D.N.Y. 2018). Because the Trust Agreement provides that the Fund can pay for administrative expenses and indemnify its trustees, there is no issue about the availability of funds as a matter of simple contract-in fact, under the reasoning of McCutchen , surcharge is allowable.
H. Surcharge Does Not Require an Injunction
Finally (albeit for the first time in reply), the Welfare Fund argues that courts in this circuit do not recognize a standalone surcharge remedy; rather, to constitute an equitable remedy, the surcharge must be accompanied by an injunction. (Reply Mem. of Law in Further Supp. of the Local 15 Welfare Fund Defs.' Mot. for Summ. J., Dkt. No. 95 at 2-7.) The Welfare Fund relies on the following language from New York State Psychiatric Ass'n , 798 F.3d 125 (2d Cir. 2015) : "where ... a plan participant brings suit against a plan fiduciary ... for breach of fiduciary duty relating to the terms of a plan, any resulting injunction coupled with surcharge ... constitutes equitable relief under 502(a)(3)." Id. at 134 (emphasis added).
This is weak sauce. There is no indication that the Second Circuit, with this one phrase, meant to restrict the scope and availability of ERISA's surcharge remedy. Rather, it was describing the types of relief available, and it viewed those types as disjunctive: "And so we hold that to the extent Denbo seeks redress for United's past breaches of fiduciary duty or seeks to enjoin United from committing future breaches, the relief sought would count as 'equitable relief' under § 502(a)(3)." Id. at 135 (emphasis added). Moreover, the Second Circuit has stated quite directly-albeit in a summary order-that it considers injunction and surcharge to be "alternative-not interdependent[.]" Osberg , 555 F. App'x at 81.
Additionally, if the unavailability of injunctive relief ruled out surcharge as a matter of law, the Court of Appeals-which *322 plainly ruled that injunctive relief was not available to DeRogatis-would have had no need to remand the case to this Court so that I could engage in the meaningless exercise of deciding whether surcharge was available.
To bolster its argument that the Second Circuit does not recognize a standalone surcharge remedy, the Welfare Fund also relies on other cases, principally Central States v. Gerber Life Ins. Co. , 984 F. Supp. 2d 246 (S.D.N.Y. 2013). That case, however, involved a section 502(a)(3) suit by a welfare plan against a life insurance company, not a case by a beneficiary against a breaching trustee. Id. at 247-48, 254. The district court concluded that this was a difference that made a difference-that Amara relief was not available to the plan, as opposed to a beneficiary. Id. at 254. That being so, the court correctly applied the Mertens line of cases and found that Central States did not state a claim for "appropriate equitable relief" under section 502(a)(3). Id.
The facts of Curran v. Aetna Life Ins. Co. , No. 13-cv-00289, 2013 WL 6049121 (S.D.N.Y. Nov. 15, 2013) -also relied on by the Welfare Fund-are likewise distinguishable, since the plaintiff there had a remedy at law under section 502(a)(1)(A)-an avenue that is closed to DeRogatis. Id. at *7-*8.
Finally, and somewhat perplexingly, the Welfare Fund cites D'Iorio v. Winebow, Inc. , 920 F. Supp. 2d 313 (E.D.N.Y. 2013), a case in which the district court expressly found that the Plaintiff had "alleged facts which establish surcharge remedy as an equitable basis for the monetary relief that she seeks," id. at 322, but at the same time quite clearly stated that she had "failed to state a § 502(a)(3) claim under a theory of estoppel or reformation," id. at 323.
In short, there is simply no support for the proposition that injunctive relief is a necessary prerequisite to seeking surcharge.
II. DeRogatis' Cross-Motion for Summary Judgment Is Denied
DeRogatis cross-moves for summary judgment on the second element of her claim for breach of fiduciary duty, on the basis of footnotes in the Second Circuit's opinion. (Mem. of Law in Opp. to the Mot. for Summ. J. Filed by the Local 15 Welfare Fund Defs., Dkt. No. 94 at 15-17.) Her motion is denied. In every section of the opinion, the Court of Appeals was careful to phrase its conclusions in the patois of Rule 56, finding specifically with regards to the breach element that:
• it was "at least questionable whether the SPD clearly alerts participants to the consequences of early retirement for their health benefits," and
• "whether the [Welfare] Fund's various communications with the DeRogatises exacerbated the lack of clarity inherent in the SPD and thereby provided the DeRogatises with materially misleading information ... presents a genuine dispute of material fact."
DeRogatis IV , 904 F.3d at 198 (internal quotations and alterations omitted). The Court declines DeRogatis' invitation to rewrite the Second Circuit's clear opinion and to exceed the scope of its mandate.
CONCLUSION
For the reasons stated above, the Welfare Fund's motion for summary judgment and DeRogatis' cross-motion for summary judgment are both denied.
The Clerk of Court is respectfully requested to close the motions at Dkt. Nos. 86 and 91.

The defendants are not the plans themselves, but rather the Boards of Trustees of both plans, and several individually named trustees. In keeping with the Second Circuit's naming conventions, for Civil Action No. 14-8863, Defendants Board of Trustees of the Welfare Fund of the International Union of Operating Engineers Local 15, 15A, 15C & 15D, AFL-CIO, and the individual trustees, are referred to collectively as the "Welfare Fund Defendants" or simply the "Welfare Fund." For Civil Action No. 13-8788, the Board of Trustees of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers, and the individual trustees, are referred to collectively as the "Pension Plan Defendants" or simply the "Pension Plan."

Curiously, the Welfare Fund does not address whether "related benefits" might include pension benefits.